IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JAVIER CABRAL, | § | NO. 5:14-CV-1037-DAE |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| MEGAN J. BRENNAN, | § | |
| United States Postmaster General, | § | |
| | § | |
| Defendant. | § | |
| _____ | § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

The matter before the Court is Defendant Megan J. Brennan,[1] United

States Postmaster General's ("Defendant") Motion for Summary Judgment.  (Dkt.

# 27.)  On February 22, 2016, the Court held a hearing on the motion.  At the

hearing, Arthur Vega, Esq., represented Plaintiff Javier Cabral ("Plaintiff"), and

Robert Shaw-Meadow, Esq., represented Defendant.

After careful consideration of the memoranda in support of and in

opposition to the motion, and in light of the parties' arguments at the hearing, the

Court, for the reasons that follow, **GRANTS IN PART** and **DENIES IN PART**

Defendant's Motion for Summary Judgment (Dkt. # 27).

_____

[1] Megan J. Brennan became the Postmaster General in February 2015, succeeding
Patrick R. Donahue, the Postmaster General when this suit was initiated in
November 2014.  (See Dkt. # 1.)

## BACKGROUND

In May 2004, Plaintiff became a letter carrier with the United States Postal Service in San Antonio, Texas.  (Dkt. # 1 at 2.)  In June 2005, Plaintiff was assigned to the Laurel Heights Postal Service Station.  (Id.)  Plaintiff contends that his duties as a letter carrier were to deliver mail in an efficient manner.  (Id.) During his employment with Defendant, Plaintiff asserts that he experienced discrimination, harassment, and retaliation.

First, on March 17, 2012, Plaintiff alleges that he filed an internal Equal Employment Opportunity ("EEO") complaint against his supervisors, Arnold Pena and Mike Stewart, complaining that he was discriminated against based on his age and that he suffered retaliation.  (Id.)  Specifically, Plaintiff asserts that Stewart threatened him with discipline if he failed to make the time standards set by Defendant and that Stewart engaged in yelling at Plaintiff in an attempt to intimidate and harass him.  (Id. at 3.)  Plaintiff contends that based on this conduct, he filed a postal union grievance complaining of discrimination based on his race and ethnic background.  (Id.)

On April 24, 2012, Plaintiff alleges that he was issued a fourteen day suspension, but that the suspension was reduced to a letter of warning—a lesser punishment—after he filed his union grievance.  (Id.)  Thereafter, on June 29,

2012, Plaintiff contends that he and Defendant engaged in mediation for his EEO complaint, but that no resolution was reached.  (Id.)

Plaintiff further asserts that on July 19, 2012, Stewart engaged in abusive language towards him in the presence of a customer, resulting in Plaintiff's filing another internal grievance.  (Id. at 4.)  In response to this grievance, Plaintiff states that the Defendant's internal resolution team found that Stewart violated provisions of the employee manual.  (Id.)  According to Plaintiff, the resolution team responded by reminding "employees to maintain a harmonious working relationship and not do anything that would contribute to an unpleasant working environment."  (Id.)

In September 2012, Plaintiff contends that he filed a second EEO claim against Stewart and Pena alleging age and retaliatory discrimination.  (Id. at 5.)  Subsequently, Plaintiff alleges that Pena instructed him not to wear a hat because it was an unauthorized apparel item.  (Id.)  Plaintiff asserts, however, that other employees wore unauthorized items and that he was specifically targeted for discipline.  (Id.)  He contends that Pena publicly announced to Plaintiff's coworkers that if Pena "wrote them up" for not wearing authorized apparel then they would have to blame Plaintiff.  (Id.)  Plaintiff states that as a result of this, he filed another internal grievance which was settled in his favor on October 4, 2012. (Id.)

3

Subsequently, on October 30, 2012, Plaintiff contends that Pena called him into his office and threatened to have Plaintiff terminated unless Plaintiff abided by the time standards for work required by Defendant.  (Id. at 5–6.) According to Plaintiff, he filed another internal grievance based on this incident, but that the resolution was that Plaintiff did not submit sufficient evidence.  (Id. at 6.)

Thereafter, on October 31, 2012, Plaintiff contends that mediation for his second EEO claim occurred, but that no resolution was reached.  (Id.)  Plaintiff alleges that he was subsequently harassed while he was on vacation, on November 26, 2012, when he received a Letter of Warning, a disciplinary action, by Mark Harpel and Pena.  (Id.)  Plaintiff subsequently filed another internal grievance as a result of the Letter of Warning.  (Id.)  He contends that this grievance resulted in the removal and expungement of the Letter of Warning from his personnel file on January 9, 2013.  (Id.)  Plaintiff asserts, however, that he filed two additional grievances a month apart based on Defendant's continued harassment of him.  (Id.)

On February 21, 2013, Plaintiff alleges that he was requested by a supervisor, Arturo Sanchez, to come to the postal station for a pre-disciplinary meeting, but that he was not told what the meeting was about.  (Id.)  Plaintiff believes that his rights were violated when he was told to answer questions without being informed what the meeting was about.  (Id.)

4

Plaintiff contends that on February 26, 2013, he was falsely accused by Pena, Harpel, and Sanchez, of striking Pena with the postal vehicle he was driving because Plaintiff had refused to provide him with his notes of the meeting with Sanchez.  (Id. at 7.)  The next day, February 27, 2013, Plaintiff contends that he was issued a Letter of Warning for driving his postal vehicle with the door open in the post office parking lot.  (Id.)  Plaintiff contends that it was common practice among mail carriers to drive with the door open and that his discipline was the result of continued harassment by Pena and Harpel.  (Id.)  Plaintiff again filed a grievance based on the Letter of Warning, resulting in a pre-arbitration settlement agreement which expunged the incident from Plaintiff's personnel office file.  (Id.)

Several months later, on May 1, 2013,[2] Plaintiff contends that he was issued a Notice of Proposed Removal ("NOPR") related to the February 26, 2013, incident where Plaintiff was accused of hitting Pena with the postal vehicle.  (Id. at 8.)  Plaintiff alleges that he filed another internal grievance and that, in June 2013, he wrote a letter to the Office of Inspector General requesting an investigation into this incident.  (Id.)  Plaintiff also contends that he wrote a letter to his Congressman, Joaquin Castro, asking his office to intervene in the matter.  (Id.)  On June 6, 2013, Plaintiff states that Larry Huron, the supervisor in charge of the

---

[2] Defendant contends the letter was issued on May 1, 2013; Plaintiff's complaint states that the letter was issued on May 4, 2013.  (See Dkt. # 27 at 9; Dkt. # 1 at 8.)  The record indicates that the letter was sent to Plaintiff on May 1, 2013.

NOPR, issued a decision which upheld the notice in regard to the February 26, 2013 incident.  (Id.)

On July 9, 2013, Plaintiff filed a third EEO claim, alleging age discrimination, retaliation, harassment, hostile work environment, and wrongful termination.  (Id.)  He contends that he filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC") on July 31, 2013.  (Id.)

On August 12, 2013, Plaintiff asserts that a union shop steward, Joseph Blancarte, met with Postmaster Robert Carr, and was informed by him that Defendant would continue to make Plaintiff's life miserable if Plaintiff "won the grievance" that Plaintiff had filed concerning the February 26, 2013 incident.  (Id.) On August 29, 2013, Plaintiff contends that the grievance was settled in arbitration and Plaintiff returned to work on September 3, 2013.  (Id. at 8–9.)  Plaintiff contends, however, that when he returned to work on that day, he was called into Harpel's office and was harassed and intimidated.  (Id. at 9.)

Two days later, on September 5, 2013, Plaintiff asserts that he wrote that Harpel was harassing him on a form that the letter carriers use to request overtime.  (Id.)  He contends that Harpel was scrutinizing Plaintiff's work performance and "badgering" him by asking questions about his mail delivery. (Id.)  He alleges that he was subject to further harassment and "badgering."  (Id.) On September 9, 2013, Plaintiff contends that he was walked out of the station by

Harpel and that Harpel took his employee identification badge and told him not to return to work until he received a call from Defendant.  (Id.)  Plaintiff was issued a letter that day, informing him that he was being placed in an off-duty status without pay for "operating his Postal Vehicle on a suspended driving license." (Dkt. # 29 at 140.)   On September 10, 2013, Plaintiff states that he amended his prior EEO complaint.  The next day, on September 11, 2013, Plaintiff alleges that he received a call from Defendant informing him to return to work the next day. (Id.)

On September 12, 2013, Plaintiff states that he returned to work, but was again escorted off the premises by Harpel.  (Id.)  He alleges that he filed two separate grievances, with the resolution of him receiving two full days pay for the days he was forced to leave by Harpel.  (Id.)  He states that he returned to work the next day, September 13, 2013.  (Id.)

Subsequently, Plaintiff asserts that he timely requested an EEOC hearing before an Administrative Law Judge ("ALJ"), and that on July 13, 2014, he filed a motion requesting the EEOC dismiss his request for a hearing and issue a Final Agency Decision on his July 31, 2013 EEOC claim.  (Id. at 12.)  The motion was granted and, on August 29, 2014, the Postal Service issued its Final Agency Decision concluding that there was insufficient evidence to support a finding of

discrimination or retaliation.  (Id.)  Plaintiff was informed of his rights to appeal the decision in federal court.

On November 24, 2014, Plaintiff filed suit in this Court alleging claims against Defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), for race/national origin and age discrimination, as well as claims for harassment, retaliation, and a hostile work environment.  (Dkt. # 1.)  On October 13, 2015, Defendant moved for summary judgment on Plaintiff's claims.  (Dkt. # 27.)  Plaintiff filed his response on November 10, 2015 (Dkt. # 32), and Defendant filed a reply on December 8, 2015 (Dkt. # 35).  The pending motion is discussed below.

## LEGAL STANDARD

A movant is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a); see also Meadaa v. K.A.P. Enters., L.L.C., 756 F.3d 875, 880 (5th Cir. 2014).  A dispute is only genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the nonmoving party must

come forward with specific facts that establish the existence of a genuine issue for trial. Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc., 738 F.3d 703, 706 (5th Cir. 2013) (quoting Allen v. Rapides Parish Sch. Bd., 204 F.3d 619, 621 (5th Cir. 2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, the court must draw all reasonable inferences in favor of the nonmoving party, and it "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012) (quoting Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003)).

<u>ANALYSIS</u>

As an initial matter, Plaintiff's response to Defendant's summary judgment motion indicates that he has withdrawn his claims for disparate treatment under Title VII. (Dkt. # 32 at 8.) Therefore, Plaintiff's claims of age discrimination, national origin discrimination, and race discrimination under Title

VII are withdrawn, and only Plaintiff's claims for retaliation and hostile work environment remain.

Defendant moves for summary judgment on Plaintiff's remaining claims. Defendant argues that Plaintiff's claim for retaliation is without merit because a significant time gap exists between his prior protected EEOC activity and his May 1, 2013 Notice of Removal. (Dkt. # 27 at 2.) Defendant also contends that, in any event, it had multiple legitimate, non-discriminatory reasons for Plaintiff's proposed removal from employment. (Id.) Defendant asserts that summary judgment should likewise be granted on Plaintiff's hostile work environment claim because he failed to exhaust his administrative remedies for this claim and he has no proof of any disparate treatment discrimination. (Id.; Dkt. # 35.)

A. Retaliation

Plaintiff alleges that Defendant retaliated against him after he filed numerous grievances and EEO complaints. (Dkt. # 1; Dkt. # 32 at 9.) He argues that his disciplinary actions began around the same time and are separated from his protected activity by only a two-month period. (Dkt. # 32 at 10.) Because of this, Plaintiff contends that a causal connection exists between his protected activities and his subsequent disciplinary actions.

Title VII makes it an "unlawful employment practice for an employer to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, __U.S.__, 133 S. Ct. 2517, 2525, 186 L.Ed. 2d 503 (2013) (quoting 42 U.S.C. § 2000e-2(a)). Title VII prohibits retaliation against employees who engage in protect conduct, such as filing a charge of harassment or discrimination.  <u>Perez v. Region 20 Educ. Serv. Ctr.</u>, 307 F.3d 318, 325 (5th Cir. 2002).

To state a claim for retaliation under Title VII, a plaintiff must show that (1) he engaged in conduct protected by Title VII, (2) he suffered a materially adverse action, and (3) a causal connection exists between the protected activity and the adverse action.  <u>Jenkins v. City of San Antonio Fire Dep't</u>, 784 F.3d 263, 269 (5th Cir. 2015) (citing <u>Aryain v. Wal-Mart Stores Tex. LP</u>, 534 F.3d 473, 484 (5th Cir. 2008)).  Once a plaintiff has made a prima facie case, the employer must provide some "legitimate nondiscriminatory reason" for the adverse action taken. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  If the employer provides a nondiscriminatory reason, the burden shifts back to the plaintiff to show a genuine issue of material fact that the employer's proffered nondiscriminatory reason is pretext for retaliation.  <u>See</u> <u>Alvarado v. Tex. Rangers</u>, 492 F.3d 605, 611 (5th Cir. 2007).

11

      1.   <u>Causal Connection</u>

Defendant does not contest the first two elements of Plaintiff's prima facie case of retaliation.  (<u>See</u> Dkt. # 27.)  Indeed the record indicates that Plaintiff engaged in protected activity when he filed the various union grievances and EEO complaints.  Additionally, an adverse employment action occurred when (1) Plaintiff was sent the NOPR on May 1, 2013, and (2) Plaintiff was placed in off-duty status without pay on September 9, 2013.  Instead, Defendant challenges the third element of Plaintiff's prima facie case, arguing that the time gap between his protected activity and his receipt of the NOPR is insufficient to establish causation on the basis of temporal proximity.  (<u>Id.</u> at 8.)

In order to establish a causal connection as required by the third prong of the prima facie case, a plaintiff does not have to prove that his protected activity was the sole factor motivating the employer's challenged actions.  <u>Gee v. Principi</u>, 280 F.3d 342, 245 (5th Cir. 2002).  Close timing between the protected activity and the adverse action may provide the causal connection needed to make out a prima facie case of retaliation.  <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 562 n.28 (5th Cir. 2007).

The evidence produced in this case establishes that Plaintiff filed a formal EEOC complaint, dated July 31, 2013, alleging among other claims, that he received the May 1, 2013 NOPR letter as retaliation for his "making protective

disclosures and for [his] participation in protected activity." (Dkt. # 32-3 at 2.)

The protected activity that Plaintiff appears to complain of concerns both his 2012

EEO complaints as well as his various internal union grievances filed in 2012 and

2013. (See Dkt. # 1.) Plaintiff contends that he filed one such grievance after the

February 26, 2013 incident where he allegedly struck his supervisor with his postal

vehicle. (See id. at 7.) The record also indicates that Plaintiff participated as a

witness in an investigation concerning this incident and his allegations of

retaliation[3] on March 7, 2013. (Dkt. # 29 at 156.) Both of these actions constitute

"protected activity" for purposes of Title VII. See Green v. Adm'rs of Tulane

Educ. Fund, 284 F.3d 642, 657 (5th Cir. 2002), as amended on denial of reh'g and

reh'g en banc (Apr. 26, 2012) (holding that "protected activity" may be defined as

opposition to any practice made unlawful by Title VII, including making a charge,

testifying, assisting, or participating in any investigation, proceeding, or hearing

under Title VII).

Additionally, the record establishes that Plaintiff received the NOPR

on May 1, 2013. (Dkt. # 29 at 170.) In such case, the timing between Plaintiff's

grievance and subsequent interview concerning the situation was approximately

two months. The Fifth Circuit has held that "a time lapse of up to four months"

---

[3] The notes from the interview indicate that Plaintiff stated during the interview that "he felt management might be retaliating against him for things that he had done before" and that "[h]e said that if a grievance went his way, management would come after him." (Dkt. # 29 at 156.)

may be sufficiently close to establish a causal connection.  Evans v. Houston, 246 F.3d 344, 354 (5th Cir. 2001).   Still, temporal proximity between the protected activity and the alleged adverse employment action, by itself, is insufficient to create a genuine issue of material fact for the element of causation.  Kopszywa v. Home Depot USA, Inc., 620 F. App'x 275, 280 (Aug. 11, 2015); DeHart v. Baker Hughes Oilfield Operations, Inc., 214 F. App'x 437, 443 (5th Cir. 2007). Temporal proximity should be weighed by the court "as part of the entire calculation of whether [the employee] has shown a causal connection between the protected activity and the adverse employment action."  Hague v. Univ. of Tex. Health Sci. Ctr., 560 F. App'x 328, 334 n. 7 (5th Cir. 2014).

Noting that "the existence of a causal link between a protected activity and an adverse employment action is a 'highly fact specific' and difficult question," the Fifth Circuit has identified factors supporting causation including "(1) the employee's past disciplinary record, (2) whether the employer followed its typical policy and procedures in terminating the employee, and (3) the temporal proximity between the employee's conduct and termination."  Smith v. Xerox Corp., 371 F. App'x 514, 520 (5th Cir. 2010).  Some cases have held that where only temporal proximity exists, to be adequate evidence of causality for a prima facie case, it must be very close.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268,

273 (2001); Strong v. Univ. Healthcare Sys., LLC, 482 F.3d 802, 808 (5th Cir. 2007).

Defendant has produced summary judgment evidence that Plaintiff had received several letters of warning and suspensions for various incidents including failure to follow instructions and that this contributed to his receipt of the NOPR.  (See, e.g., Dkt. #29 at 66.)  However, Plaintiff has produced summary judgment evidence that some of these warnings and letters were resolved in his favor and/or without his experiencing any ultimate disciplinary action.  (See, e.g., Dkt. # 32-10 at 2.)  Because the standard for satisfying the causation elements at the prima facie stage is "much less stringent" than the "but-for" causation that a jury must find, then Plaintiff has at least provided sufficient facts to create a genuine issue of material fact that his protected activity was causally connected to his receiving the NOPR on the basis of close temporal proximity.

Furthermore, the evidence also establishes that Plaintiff suffered an adverse employment action when he was "placed in an off-duty status without any pay" on September 9, 2013.[4]  (Dkt. # 29 at 170.)  Because Plaintiff filed his latest

---

[4] Defendant argues Plaintiff's two-day suspension did not constitute an adverse employment action because Plaintiff was not harmed and he was ultimately reimbursed for the days he was suspended.  (Dkt. # 27 at 10.) Defendant also contends that Plaintiff's schedule was not changed and he did not lose any benefits as a result of the suspension.  (Id.)  Nevertheless, because "[a] materially adverse action, in the retaliation context, is one which might dissuade[] a reasonable worker from making or supporting a charge of discrimination," then the Court

EEOC complaint on July 31, 2013, then the close timing between these two events—slightly more than one month—indicates a sufficient causal connection to survive summary judgment.  See Breeden, 532 U.S. 268, 273–74 (2001) (approving that a close timing of approximately six weeks between protected activity and adverse action could, by itself, establish causation).

Accordingly, Plaintiff has, for purposes of summary judgment, met his burden of demonstrating a prima facie case of retaliation, and the burden shifts to Defendant to offer some legitimate, nondiscriminatory reason for the adverse action.

2.    Legitimate, Non-Retaliatory Reason

Defendant has produced several legitimate, nondiscriminatory reasons for Plaintiff's NOPR on May 1, 2013, and his subsequent placement on off-duty status on September 9, 2013.  In regard to the NOPR, Defendant contends that Plaintiff demonstrated multiple instances of not following supervisory instructions. (Dkt. # 24 at 3.)  First, Defendant asserts that on February 26, 2013, Plaintiff met with two of his supervisors, Harpel and Sanchez, for the purpose of gathering

---

finds that Plaintiff's placement in off-duty status, without pay and whether or not he was subsequently reimbursed, is a materially adverse action.  Jenkins v. City of San Antonio Fire Dep't, 784 F.3d 263, 269 (5th Cir. 2015); see also Burlington N. & Santa Fe Ry. Co. v White, 548 U.S. 53, 72–73 (2006) ("A reasonable employee facing the choice between retaining her job (and paycheck) and filing a discrimination complaint might well choose the former. That is to say, an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay.").

information in support of one of Plaintiff's grievances concerning the February 21, 2013 incident where Plaintiff was disciplined for driving with his postal vehicle door open.  (Id.)  According to Defendant, Plaintiff took notes during the meeting and when asked by Harpel and Sanchez for copies of his notes, Plaintiff refused to provide them in violation of Plaintiff's union contract.  (Id.)  Defendant also contends that Plaintiff was instructed to remain in the office so that Defendant's management could formally serve Plaintiff with a letter of warning concerning the February 21, 2013 incident, but that Plaintiff "clocked out and exited the building" before he could be served.  (Id. at 4.)

After Plaintiff exited the building, Defendant asserts that three postal station managers—Pena, Harpel, and Sanchez—called out to Plaintiff to come back into the building, but that Plaintiff got into his postal vehicle and ignored "[a]t least two of the three supervisors" that were "shouting or motioning for Plaintiff to stop his vehicle, but he did not do so."  (Id.)  Defendant contends that while driving the postal vehicle, Pena and Harpel noticed Plaintiff talking on cell phone, a violation of Postal Service regulations, and that he was not wearing his seatbelt.  (Id. at 4–5.)

As Plaintiff began driving towards the parking lot exit, Defendant asserts that Harpel and Pena approached the vehicle and "instructed [Plaintiff] repeatedly to turn off his vehicle and to open the door, but he did not do so."  (Id.

17

at 5.)  Defendant contends that as Harpel and Pena approached the vehicle,

Plaintiff accelerated the vehicle causing Harpel to jump out of the way to avoid

getting hit by the side view mirrors; however, Pena was hit in the leg by the vehicle

but was uninjured.  (Id.)

Defendant asserts that once Plaintiff's union representative, Tony

Boyd, arrived at the parking lot subsequent to this incident, Plaintiff was placed on

immediate leave under his Collective Bargaining Agreement ("the Agreement").

(Id.)  Defendant contends this was an "emergency procedure" as defined in the

Agreement which allows management to put mail carriers in an off-duty status

without pay for failing to observe safety regulations.  (Id.)  According to

Defendant, Plaintiff remained off duty for approximately six months, from

February 26, 2013, until September 3, 2013, and that he was either on leave

without pay or on administrative leave with pay during this time.  (Id. at 5–6.)

Defendant states that the decision on May 1, 2013, to issue the NOPR

was based on three major charges: (1) Plaintiff's unacceptable conduct in failing to

follow supervisory instructions when: Plaintiff failed to turn over interview notes

when requested by management, failed to remain in office when requested, ignored

station manager's instructions not to leave parking lot, and failed to turn off

ignition or open postal vehicle's door when requested; (2) Plaintiff's unacceptable

performance in talking on his cell phone and failing to wear his seatbelt while

18

driving the postal vehicle, and (3) Plaintiff's unacceptable performance in failing to operate his postal vehicle safely when it allegedly struck Pena in the leg.  (Id. at 6.)

In regard to Plaintiff's placement in off-duty status on September 9, 2013, Defendant contends that the legitimate, nondiscriminatory reason for this decision was that management became aware on this date that Plaintiff's driver's license was suspended due to a prior arrest for driving while intoxicated ("DWI") and that Plaintiff had failed to notify management.  (Id. at 7.)  Defendant states that failure to notify a supervisor of a suspension of a license is a violation of the Agreement.  (Id.)

Because Defendant has offered legitimate, nondiscriminatory reasons for the adverse actions, the burden shifts back to Plaintiff to show a genuine issue of material fact that the employer's proffered nondiscriminatory reason is a pretext for discrimination.  See Alvarado, 492 F.3d at 611.

   3.   Pretext

Unlike the causal connection element, the Fifth Circuit has held "temporal proximity alone is not sufficient to establish the 'but-for' causation in the pretext prong of the analysis."  Wood v. Chertoff, 523 F. Supp. 2d 509, 523 (W.D. Tex. 2007) (citing Strong v. Univ. Healthcare Sys., L.L.C., 482 F.3d 802, 808 (5th Cir. 2007)); see also Nassar, __U.S.__, 133 S. Ct. at 2534 (affirming the

"but-for" causation standard for retaliation cases).  Temporal proximity is still evidence of pretext, but it cannot alone show pretext because such a rule would "unnecessarily tie the hands of employers."  <u>Strong</u>, 482 F.3d at 808 (citing <u>Breeden</u>, 532 U.S. at 273).  A plaintiff's own subjective belief that the employer's proffered reason is false is also not sufficient to establish an issue of material fact on pretext.  <u>See</u> <u>Shackelford v. Deloitte & Touche, LLP</u>, 190 F.3d 398, 408 (5th Cir. 1999).  A plaintiff must provide specific evidence "which could support a finding that [h]e would not have [experienced an adverse employment action] in the absence of h[is] having engaged in protected conduct."  <u>Id.</u> at 408–09.  In other words, a plaintiff must prove "that [h]e would not have [experienced an adverse employment action] but for [a defendant's] alleged retaliation."  <u>Strong</u>, 482 F.3d at 808.

Plaintiff argues that Defendant's proffered nondiscriminatory reasons are pretextual because all of the disciplinary actions cited by Defendant were resolved and expunged from Plaintiff's record.  (Dkt. # 32 at 10.)  Plaintiff contends that in some of the actions, Defendant was found to be responsible for the mistreatment of Plaintiff.  (<u>Id.</u>)  Plaintiff identifies that following pieces of evidence that he claims support an inference that Defendant's proffered reasons for the NOPR and his placement in off-duty status on September 9, 2013, is pretext for unlawful retaliation: (1) the grievance decision from his fourteen-suspension in

April 2012 which reduces his suspension to a letter of warning; (2) the October 13,

2013 pre-arbitration settlement agreement concerning his letter of warning issued

on February 27, 2013, which expunges the letter from his personnel file; and (3)

the August 28, 2013 pre-arbitration settlement agreement from Plaintiff's

grievance filed subsequent to his receipt of the May 1, 2013 NOPR, which reduces

the NOPR punishment to a fourteen-day suspension.  Plaintiff further alleges that

contrary to Defendant's allegations in the NOPR, he does not have a record of

"multiple instances of not following supervisory instructions."  (Dkt. # 32-1 at 3.)

a.    <u>April 2012 Grievance Decision</u>

Plaintiff's evidence of the grievance decision from his fourteen-day

suspension in April 2012 is not sufficient summary judgment evidence that the

NOPR, issued over one year later on May 1, 2013, was pretext for retaliation.  The

outcome of the grievance, dated June 12, 2012, states that "the case file evidenced,

at the very least, a troublesome relationship between the grievant and the

supervisor."  (Dkt. # 32-12 at 4.)  Defendant's management was reminded of its

requirement "to maintain an atmosphere between employer and employee which

assures mutual respect."  (<u>Id.</u> at 5.)  Plaintiff was reminded of his "requirement to

maintain harmonious working relationships and [his] requirement to maintain an

atmosphere of mutual respect [and not to] negate management's right to

supervise."  (<u>Id.</u>)  Ultimately, the outcome of the decision resulted in Plaintiff's

21

punishment being reduced from a fourteen-day suspension to a letter of warning.

(Id.)  Nevertheless, this evidence, by itself is not sufficient to show pretext.  The

outcome of this grievance, while certainly indicating that both management and

Plaintiff were at fault in this incident, is too far attenuated from Plaintiff's May 1,

2013 NOPR to create a genuine issue of material fact that Plaintiff's discipline was

in fact retaliation for filing this grievance.

### b.    October 13, 2013 Settlement Agreement

Likewise, Plaintiff's evidence of the October 13, 2013 pre-arbitration

settlement agreement (the "settlement agreement") of the letter of warning issued

on February 27, 2013, is not sufficient evidence to create a factual dispute that

Plaintiff's NOPR was pretext for retaliation.  The letter of warning concerns

Plaintiff's alleged unacceptable performance for working in an unsafe manner and

failure to follow instructions for the incident on February 21, 2013, when he drove

his postal vehicle with the door open and ignored instructions to return to the

postal station.  (Dkt. # 32-13.)  The settlement agreement states that the parties

mutually agreed to the settlement of Plaintiff's grievance and that the letter of

warning would be expunged from Plaintiff's personnel file.[5]  (Id.)  The May 1,

---

[5] Defendant argues that the Court should not consider the settlement agreement
because it states that the resolution was "reached on a non-precedential, non-
citable basis" and "does not constitute a waiver of either party's position on similar
cases."  (Dkt. # 35 at 4–5.)  Additionally, the settlement agreement states that "[i]t
is not to be cited or referenced by either party in future cases which may arise."

2013 NOPR was issued on the same basis as the February 27, 2013 letter of warning—unacceptable conduct for failure to follow instructions of supervisor—but it concerned different events.  (Cf. id., with Dkt. # 29 at 157.)  The NOPR concerned Plaintiff's alleged disobedience of his supervisors' instructions to remain in the station subsequent to an interview on February 26, 2013, talking on his cell phone while driving his postal vehicle, ignoring instructions to stop the vehicle, failure to wear a seat belt while driving the vehicle, and hitting a manager with his postal vehicle.  (Id. at 157.)

            Plaintiff therefore has not produced sufficient evidence that he would not have received the NOPR "but for" Defendant's retaliation for his filing the grievance related to the February 21, 2013 incident.  Plaintiff has not rebutted Defendant's legitimate nondiscriminatory reasons for the NOPR; he has not produced sufficient evidence to the contrary that he was falsely or incorrectly disciplined for his failure, among others, to follow his supervisor's instructions on February 26, 2013, including stopping the vehicle he was driving, talking on a cell phone, and not wearing a seat belt.

---

(Id.)  Defendant provides no support, however, for its proposition that a federal district court cannot consider the outcome of the settlement agreement in reviewing Plaintiff's ultimate disciplinary action for that incident.  Instead, the language in the settlement agreement appears to be directed toward any future internal grievances for subsequent incidents filed by the parties to the settlement agreement and prior to any review by a federal district court.

23

c.      August 28, 2013 Settlement Agreement

On the other hand, Plaintiff's production of the pre-arbitration

settlement agreement from Plaintiff's grievance filed subsequent to his receipt of

the May 1, 2013 NOPR provides slight evidence that Plaintiff's placement in off-

duty status on September 9, 2013, may be pretext for retaliation.  (See Dkt. # 32-15

at 2.)  The mutually agreed settlement concerning the grievance is signed August

28, 2013, prior to his suspension, and reduces the NOPR punishment to a fourteen-

day suspension.  (Id.)  The settlement agreement states that the incident would

remain in Plaintiff's personnel file for one year, but would be expunged if Plaintiff

did not have any subsequent disciplinary actions filed during that year.  (Id.)

As Defendant proffers, Plaintiff was placed in off-duty status and

without pay on September 9, 2013, for violating internal postal regulations because

he operated a vehicle with a suspended license.  (Dkt. # 29 at 140.)  Defendant

contends that it became aware of Plaintiff's license suspension only that day and

placed Plaintiff in an off duty status immediately upon learning of the suspension.

(Id.)  However, Plaintiff contends that his supervisors were well aware of his

license suspension since at least February 26, 2013, but waited six months to bring

disciplinary action against him.  (Dkt. #32-1 at 8.)  Plaintiff also contends that, in

any case, he had a valid occupational license to drive that day.  (Id.)  If Plaintiff's

contention are true, then they could support a retaliation claim for his September 9,

2013 placement in off-duty without pay status based on his protected activities of

filing a grievance upon receipt of the NOPR and his July 31, 2013 EEOC charge.

The provision in the Agreement that Plaintiff was disciplined for

violating on September 9, 2013, states in relevant part:

> An employee's driving privileges will be automatically revoked or
> suspended concurrently with any revocation or suspension of State
> driver's license and restored upon reinstatement.  Every reasonable
> effort will be made to reassign such employee to non-driving duties in
> the employee's craft or in other crafts.  In the event such revocation or
> suspension of the State's driver's license is with the condition that the
> employee may operate a vehicle for employment purposes, the
> employee's driving privileges will not be automatically revoked. . . .
> An employee must inform the supervisor immediately of the
> revocation or suspension of such employee's State driver's license.

(Dkt. # 29 at 187–88 (emphasis added).)  The "Emergency Procedure" section of

the Agreement states in relevant part:

> An employee may be immediately placed on an off-duty status
> (without pay) by the Employer, but remain on the rolls where the
> allegation involves intoxication (use of drugs or alcohol), pilferage, or
> failure to observe safety rules and regulations, or in cases where
> retaining the employee on duty may result in damage to U.S. Postal
> Service property, loss of mail or funds, or where the employee may be
> injurious to self or others.

(Id. at 184–85.)

The record indicates that Plaintiff was arrested for DWI on

February 9, 2012, and convicted for this offense on February 11, 2013.  (Dkt. # 29

at 261–63)  As a result of the conviction, Plaintiff's license was suspended from

February 11, 2013, through August 11, 2013.  (Id. at 268.)  During this time,

25

however, Plaintiff was convicted of driving while his license was suspended.  (Id. at 264.)  Plaintiff's license was further suspended from July 3, 2013, through December 31, 2013.  (Id. at 265.)

The record further indicates that on September 9, 2013, Plaintiff had an occupational license, permitting him to drive at work, but that it may have been invalid on that day due to his failure to pay a $10 administrative fee.  (Id. at 17, 265.)  Additionally, the record indicates that Plaintiff, during deposition, testified that he did not know of his obligation as a mail carrier to inform his supervisor immediately of the revocation or suspension of his state driver's license.  (Id. at 32.)  Plaintiff also admitted during deposition that the he did not inform his supervisors, Harpel and Pena, that his license was previously suspended for his DWI.  (Id.)  Plaintiff further admitted that on September 9, 2013, in the course a regular routine check, Harpel asked to see Plaintiff's valid Texas driver's license, but that Plaintiff did not show any license to him.  (Id. at 33.)  However, Plaintiff stated in deposition that he "told him he had an occupational driver's license," but that no one asked him to produce it.  (Id.)

Plaintiff contends in his EEOC complaint that his supervisors "waited six (6) months to charge [him] with driving with a suspended license," but that they "were aware and had knowledge that [he] also held an occupational license." (Dkt. # 32-14 at 14.)  However, Plaintiff has no evidence, other than his own

statement to the EEOC that Defendant knew about his license suspension prior to September 9, 2013.  Plaintiff's assertion, by itself, does not create a factual issue as to whether Defendant knew about his suspended license prior to September 9, 2013.  See Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 379 n.22 (5th Cir. 2010) (holding that self-serving statements are insufficient to overcome summary judgment).  In any case, as discussed above, Plaintiff admitted in his deposition that he failed to tell Defendant about his suspension of this license.

Nevertheless, the letter informing Plaintiff of his placement in off-duty status and without pay states only that Defendant was provided information that Plaintiff had allegedly violated the Agreement provision cited above "by operating a Postal Vehicle on a suspended driving license."  (Dkt. # 29 at 140.)  Thus, contrary to Defendant's proffered legitimate, nondiscriminatory reason for Plaintiff's placement in off-duty status, the letter does not state that Plaintiff was being disciplined for failing to inform Defendant about the actual license suspension, only that Plaintiff was allegedly operating the vehicle with a suspended license.  (See id.)  Plaintiff has produced some evidence, however slight, that he had a valid occupational license and therefore was legally authorized to drive on September 9, 2013.  (See Dkts. ## 32-8 at 11; 32-14 at 14; see also Dkt. # 29 at 265–267.)

27

Still, Defendant disputes that Plaintiff's occupational license was actually valid on that date due to a technical requirement by the State that Plaintiff pay an additional fee to renew the occupational license.  (Dkt. # 24 at 8.) Defendant relies on Plaintiff's state court amended petition for an occupational license, which explains to the state court that the Department of Public Safety ("DPS") "did not honor his prior payment of $10 for the issuance of his original Occupational Driver's License and instead required an additional $10 fee for the issuance of the Amended/Extended Occupational Driver's License."  (Dkt. # 29 at 265–66.)  The petition further states that "DPS received the Petitioner's signed and certified Court Order for an Occupational Driver's License but failed to notify Petitioner that an additional $10 would be required."  (Id.)  The petition states that "Petitioner did send the additional $10 required on September 9, 2013," but that "Petitioner's certified Court Order has since expired, thus Petitioner seeks another certified Court Order so that Petitioner can legally drive during this 'gap' in time." (Id.)  A state court order dated September 12, 2013, grants Plaintiff an occupational driver's license.  (Id. at 264.)

Whether Plaintiff's occupational license was effective on September 9, 2013, is relevant to the ultimate issue of whether Plaintiff was "operating his Postal Vehicle on a suspended driving license" on September 9, 2013.  (Dkt. # 29 at 140.)  Plaintiff's deposition testimony states that he told his supervisor, Harpel,

28

that he had an occupational license on September 9, 2013, after Harpel told Plaintiff that he was being "walk[ed] off the job" for a suspended license.  (Id. at 33.)  Although Plaintiff's deposition testimony also states that he failed to actually produce a copy of his occupational license to Harpel at that time, Plaintiff also stated that Harpel never asked him to produce it, although Plaintiff "had the documentation with" him.  (Id. at 33–34.)  Furthermore, Defendant has no evidence that Harpel or any other supervisor was aware at that time that Plaintiff's occupational license may have been invalid on September 9, 2013, due to a technical requirement by DPS that Plaintiff pay an additional fee.

On this record, while it is a very close call, Plaintiff has produced some evidence, although barely sufficient, to create a genuine issue of material fact as to whether Defendant's proffered nondiscriminatory reason for Plaintiff's placement in off-duty status without pay on September 9, 2013—that he failed to notify a supervisor of the suspension of his license—is pretext for retaliation. Plaintiff's evidence, in combination with the temporal proximity of the events in this case, provides just enough evidence to create a factual dispute that he would not have been placed in an off-duty status without pay but for Defendant's alleged retaliation based on Plaintiff's NOPR grievance and his EEOC complaint.  See Strong, 482 F.3d at 808.  Accordingly, summary judgment is denied for Plaintiff's retaliation claim relating to his placement in off-duty status on September 9, 2013.

B.    <u>Hostile Work Environment</u>

Plaintiff also asserts a claim against Defendant for a hostile work environment.  (Dkt. # 1 at 12.)  Plaintiff contends that he is a member of a protected class because he is Mexican-American and that he experienced harassment and a hostile work environment based on his race and national origin.  (<u>Id.</u>; Dkt. # 32 at 12.)

1.    <u>Failure to Exhaust Administrative Remedies</u>

Defendant moves for summary judgment on Plaintiff's hostile work environment claim on the basis that Plaintiff failed to exhaust his administrative remedies.  (Dkt. # 27 at 12.)  Defendant contends that Plaintiff was advised on October 4, 2013, that his hostile work environment claim was not accepted by the EEOC and that he had seven days to provide a response specifying his disagreement.  (<u>Id.</u>; Dkt. # 29 at 125.)  Defendant states that although Plaintiff submitted a letter in response to the EEOC's earlier framing of his issues, he failed to respond to the latest letter.  (<u>Id.</u>)  Defendant asks the Court to find that Plaintiff's hostile work environment claims were abandoned.  (<u>Id.</u>)

The record in this case indicates that Plaintiff's July 31, 2013 EEOC complaint alleges, among other claims, "subjection to hostile work environment."  (Dkt. # 32-3 at 2.)  In a letter dated August 28, 2013, the EEOC determined that Plaintiff's hostile work environment claim was not accepted

because his allegations did "not qualify as harassing conduct."  (Dkt. # 32-4 at 2 n.1.)  In accordance with the EEOC's requirement that Plaintiff "provide a written response specifying the nature of [his] disagreement within seven (7) calendar days of receipt of" the letter, on September 3, 2013, Plaintiff's representative filed a response disagreeing with the EEOC's finding that Plaintiff was not subject to a hostile work environment.  (Dkt. # 32-5.)

Subsequently, on September 19, 2013, Plaintiff mailed an "Information for Pre-Complaint Counseling" form to the EEOC, adding claims for his placement in off-duty status on September 9, 2013, and stating again that he was subject to harassment and a hostile work environment.  (Dkt. # 32-6 at 2.)  On October 4, 2013, the EEOC filed a response acknowledging receipt of Plaintiff's form and permitting the amendment of his July 31, 2013 EEOC complaint.  (Dkt. # 32-7 at 2.)  However, once again, the letter noted that Plaintiff alleged harassment/hostile work environment, but that his allegations did not qualify as harassing conduct.  (Id. at 2 n.1.)  Again, the letter informed Plaintiff that he could file any disagreement with this decision within seven days of the receipt of the letter.  (Id. at 3.)  The Final Agency Decision from the EEOC did not include any discussion or analysis of a harassment or hostile work environment claim.  (Dkt. # 32-8.)

There is no dispute that Plaintiff followed the EEOC's procedure in objecting to its framing of the issues in the first letter.  (Dkt. # 32- 4 at 2.)  The stern letter in response sent by Plaintiff's representative to the EEOC sufficiently informs it of Plaintiff's position that a harassment/hostile work environment claim should have been considered by the EEOC.  (See Dkt. # 32-5.)  The second EEOC letter indicates that it interpreted Plaintiff's "Information for Pre-Complaint Counseling" form as amending his claims to add race, national origin, and age discrimination, and also retaliation, in regard to Defendant's placement of Plaintiff in off-duty status on September 9, 2013.  While the letter addresses Plaintiff's claim for harassment/hostile work environment in the same manner as it did in the first letter, it is unclear, and Defendant does not provide sufficient support for its contention, that Plaintiff was required to object to the second letter on the same basis as that which he had previously objected.  Nevertheless, because the second letter purports to amend Plaintiff's initial EEOC complaint only insofar as his placement in off-duty status on September 9, 2013, then any objection a second time by Plaintiff would only be required to address this amendment.

In any case, because the Court finds below that Plaintiff has failed to produce sufficient summary judgment evidence for his hostile work environment claim, the Court declines to find that Plaintiff failed to exhaust his administrative remedies.

2.     Lack of Sufficient Evidence

In the alternative, Defendant contends that Plaintiff fails to raise any factual issues sufficient to defeat summary judgment on his hostile work environment claim.  (Dkt. # 27 at 13.)  Specifically, Defendant challenges Plaintiff's claim that any alleged harassment he experienced was based on his protected class.  (Id.)  Defendant argues that Plaintiff's evidence of harassing conduct allegedly experienced by his coworkers actually negates his contention that the harassment was based on his race or national origin because others outside that class were also allegedly harassed according to Plaintiff's contention.  (Id.) Defendant also argues that Plaintiff has failed to present any evidence that any alleged harassment was severe or pervasive.  (Id. at 14.)

To establish a claim for a hostile work environment, a plaintiff must show (1) he belongs to a protected group; (2) he was subject to unwelcome harassment; (3) the harassment complained of was based on race or national origin; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action.  Williams-Boldwar v. Denton Cnty., Tex., 741 F.3d 635, 640 (5th Cir. 2014).

In the context of a hostile work environment claim, "harassment is based on race if the complained-of conduct had a racial character or purpose." Jones v. Dallas Cnty., 47 F. Supp. 3d 469, 483 (N.D. Tex. 2014). A plaintiff "must demonstrate a connection between the allegedly harassing incidents and their protected status." Id.; see also Raj v. La. State Univ., 714 F.3d 322, 331 (5th Cir. 2013). For harassment to be sufficiently severe or pervasive to affect a term, condition, or privilege of employment, the environment must be deemed "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did perceive to be so." Aryain, 534 F.3d at 479 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998)).

Plaintiff's evidence in support of his hostile work environment claim includes: (1) his July 31, 2013 EEOC complaint, which alleges that Postmaster Robert Carr made statements which discriminated against Mexican-Americans (Dkt. # 32-14 at 18); (2) a coworker's statement that he heard Postmaster Carr state that he would make Plaintiff's and other coworker's "life miserable" (Dkt. # 32-17 at 2); and (3) a signed petition from postal employees at the Laurel Height postal station complaining of management harassment and intimidation, and asking that the management be removed (Dkt. # 32-10).

Plaintiff has failed to meet his burden to demonstrate that any alleged harassment was based on his protected class, nor that any harassment was severe

and pervasive.  Plaintiff contends that Postmaster Carr had a meeting with "a majority of Hispanic postal employees" and stated that [they] were a bunch of smelly carriers and [they] needed to shower more often."  (Dkt. # 32-14 at 18.) Even if these remarks were directed towards the Hispanic employees, it was not severe or pervasive enough to affect any term or condition of Plaintiff's employment.  The comment occurred during a single, isolated event, it was not physically threatening or humiliating, and it was not directed specifically at Plaintiff.  See Royal v. CCC&R Tres Arboles, L.L.C., 736 F.3d 396, 401 (5th Cir. 2013) (stating factors courts must consider in determining if work environment is sufficiently abusive or hostile).  Accordingly, Postmaster Carr's comment is insufficient to meet Plaintiff's burden for the fourth element of a hostile work environment claim.  Cf. Walker v. Thompson, 214 F.3d 615, 626 (5th Cir. 2000) (finding a fact issue as to whether harassment was severe or pervasive when, over a period of three years, plaintiffs were subject to "comparisons to slaves and monkeys, derisive remarks regarding their African heritage, patently offensive remarks regarding the hair of African-Americans, and conversations in which a co-worker and supervisor used the word nigger").

   Additionally, Plaintiff's evidence from his coworker that Postmaster Carr told him that he would make Cabral and other postal worker's lives miserable, fails to demonstrate that the alleged harassment or intimidation was based on

35

Plaintiff's or the other postal workers' national origin.  (See Dkt. # 32-17 at 2.)

Without such evidence, Plaintiff has not demonstrated the third element of a hostile

work environment claim.  See Williams-Boldwar, 741 F.3d at 640.  Likewise,

Plaintiff's evidence of the petition signed by his Laurel Heights postal office

coworkers fails to demonstrate that any alleged harassment or intimidation

experienced by the employees was based on race or national origin.  (See Dkt. #

32-10.)  The letter accompanying the petition alludes to Pena's mismanagement of

the Laurel Heights postal office, but it does not contain any allegations that the

alleged hostile work environment at the postal office was based on any

discrimination directed at the Hispanic employees.  (See id.)  Neither has Plaintiff

produced any evidence concerning the national origin and race of Pena or the

employees who signed the petition.

Plaintiff has failed to meet his burden to produce any factual issues

of material dispute for his hostile work environment claim.  Accordingly, summary

judgment is granted for this claim.

CONCLUSION

Based on the foregoing, the Court **GRANTS IN PART** and **DENIES**

**IN PART** Defendant's Motion for Summary Judgment (Dkt. # 27).  The motion is

**GRANTED** as to Plaintiff's age discrimination, national origin discrimination, and

race discrimination claims under Title VII, as well as Plaintiff's hostile work

36

environment claim.  The motion is **DENIED** as to Plaintiff's retaliation claim regarding his placement in off-duty status without pay on September 9, 2013.

      **IT IS SO ORDERED.**

      **DATED**: San Antonio, Texas, February 23, 2016.

_____

David Alan Ezra
Senior United States Distict Judge